UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| JOSEPH D. PELLERIN, JR. | : | DOCKET NO. 04-1647 |
|---|---|---|
| VS. | : | |
| XSPEDIUS MANAGEMENT CO. OF SHREVEPORT L.L.C. | : | MAGISTRATE JUDGE WILSON |

**MEMORANDUM OPINION**

Pursuant to 28 U.S.C. § 636(c)(1) and with the consent of all parties, the above-captioned matter was referred to the undersigned Magistrate Judge for the administration of proceedings and entry of judgment. A bench trial was held on March 13-14, 2006. Following a delay for the submission of post-trial briefs, the matter is now before the court.

From August 2000 until March 2004, Joseph D. Pellerin was employed by Xspedius Communications, LLC or a related company, as a computer programmer/analyst. Throughout his employment, Pellerin was paid a straight salary, regardless of the number of hours worked. However, after December 2001, the nature of Pellerin's work changed, and his number of hours increased. Eventually, Pellerin's unrest culminated in a February 23, 2004, Notice of Demand for Outstanding Compensation to his employer in the amount of $ 18,176.95. When no response was received within the week, Pellerin resigned.

On August 6, 2004, Pellerin filed the instant civil action against Xspedius Communications, LLC (incorrectly named Xspedius Management Co. of Shreveport, LLC) for unpaid overtime compensation, liquidated damages, and attorney's fees under the Fair Labor

Standards Act (FLSA), 29 U.S.C. § 201, *et seq*. Two dispositive motions were filed by defendant prior to trial, without success. At the close of plaintiff's evidence at trial, defendant requested judgment as a matter of law. The motion was denied.

Relevant Testimony Summary[1]

Joseph Pellerin

On or about August 28, 2000, Joseph D. Pellerin began his employment with U. S. Unwired as a programmer analyst. (Def. Exh. 4; Tr. 7).[2] He was initially paid a salary of $50,000. (Tr. 8, Def. Exh. 4).[3] Pellerin was not required to report his hours of work to anyone. (Tr. 77-78). At the time he was hired, Pellerin's work consisted of writing code for a human resources database using specifications that were provided to him. (Tr. 9). Pellerin's first ten months of employment involved coding software in the Delphi programming language. (Tr. 9-10).[4] After his first 10 months, the majority of Pellerin's time was spent on coding assignments or applications, generally involving enhancements. (Tr. 11-12).

Until December 2001, Pellerin worked eight hours a day, and occasionally maybe a little more – around forty hours per week. (Tr. 15). The company did not keep his hours; he kept his own. (Tr. 15). Pellerin was not required to report his hours of work to anyone. (Tr. 77-80).

---

[1] Plaintiff and two Xspedius employees testified at trial.

[2] Before December 2001, a division of U.S. Unwired broke off and formed Xspedius. (Tr. 16).

[3] But see, Tr. 163.

[4] According to plaintiff, coding is writing instructions to a computer so that the computer will perform specific tasks. (Tr. 10).

However, he would e-mail the number of hours that he worked each week to his supervisors. *Id*.

After December 2001, Glenn Sonnier was placed in charge of the department where Pellerin worked. (Tr. 18-19). Shortly after he took over, Sonnier divided up the department and advised Pellerin, Harley Robertson, and Michael Byrd that they were coders, and that their specific function was to maintain and support pre-existing applications. (Tr. 19). John Newell, Tony Dawson, and John Becton were to develop and design new systems that the coders were to use. *Id*. Pellerin, Robertson, and Byrd were responsible for maintenance and support of pre-existing applications. *Id*.

Pellerin's primary job responsibilities from the beginning of 2002 onwards were to provide maintenance and support to pre-existing software applications, which included adding additional input fields to pages, correcting bugs or incorrect calculations in reports, and changing the codes on reports. (Tr. 20). Pellerin would be told what needed to be written, and he would code the appropriate instructions to the computer. (Tr. 21). He was not told what language to use. *Id*. Examples of enhancements that Pellerin would code include: adding an extra field for recording additional data in an application; adding an extra column to a report; changing the sort order of the report; or taking a pre-existing report, copying it, and coding it to return the same data in a different format. (Tr. 23)

In June 2002, the workload increased substantially. (Tr. 27). At the end of the previous month, the programmers, developers, and employees in the group were notified that they were going to have to do data entry until 50,000 backlogged orders were entered and completed. (Tr. 28). Once the backlog work began, Pellerin's hours went from approximately 40 hours per week,

3

to anywhere from 55 to 70 hours per week for a four to five week duration. (Tr. 32). Pellerin continued to perform debugging, maintenance, and support work. (Tr. 31). According to Pellerin, any alterations to existing programs constituted maintenance and involved coding. *Id*. Pellerin rarely designed applications. *Id*. Application design involved less than ten percent of his time. (Tr. 32). After December 2001, Pellerin did more work on modifications to existing systems or programs. (Tr. 109). To make a modification, he had to rely on his knowledge of the computer system programming language and structure. (Tr. 110). The majority of Pellerin's work was maintenance and debugging. (Tr. 118). Debugging required Pellerin to rely on his specialized knowledge and experience in the field of computer systems, analysis, and programming. (Tr. 125-126). He had to use his analytical skills to create some reports. (Tr. 128).

Pellerin acknowledged that he developed advanced knowledge in the computer programming field through self-studies and his prior employment. (Tr. 55, 111). However, he stated that he did not frequently apply his advanced knowledge. (Tr. 56). Nevertheless, some of Pellerin's assignments were so complex that they would take more than one day to complete. (Tr. 94).

Toward the end of 2003, Pellerin was thinking of resigning because the company was not letting him use his accumulated vacation time. (Tr. 87). On February 23, 2004, Pellerin made his first and only formal demand to Xspedius for additional overtime compensation. (Tr. 59, Pl. Exh. 2). At the time Pellerin resigned, he was earning $ 57,032. (Tr. 71). The total amount claimed was $18,176.95. (Tr. 64, Pl. Exh. 2).

Over the course of his employment with Xspedius, Pellerin utilized several job titles including, systems analyst, software engineer, and programmer analyst. (Tr. 99-101).

April Cargile

April Cargile is the Manager of Software Development for Xspedius. (Tr. 175). She started with Xspedius in May 2002, as a developer. (Tr. 178, 181). According to Cargile, Pellerin was also a developer. *Id.* Cargile's job was to interface with the other departments. (Tr. 182-183). She would type up the requests from the users, including the technical specifications. (Tr. 184). After approval, the assignment was allotted to a developer. (Tr. 185-186).

Cargile created a printout of all of Pellerin's assignments from December 29, 2001 until March 2004. (Tr 187; Def. Exh. 7). The types of tasks assigned to Pellerin were characterized as "changes," "errors," "maintenance," or "ProjectTasks." (Def. Exh. 7). The majority of the assignments were "changes." *Id.* A "change" was the same as a modification to an existing system. (Tr. 198).

Findings of Fact and Conclusions of Law

a) <u>Professional Computer Exemption</u>

Pursuant to the FLSA, employers are required to pay time and a half for each hour that an employee works in excess of 40 hours each week. 29 U.S.C. § 207. However, the general rule is subject to several exemptions. *Vela v. City of Houston*, 276, F.3d 659, 666 (5th Cir. 2001). These exemptions are to be narrowly construed against the employer. *Mitchell v. Kentucky Finance Co.,* 359 U.S. 290, 295, 79 S.Ct. 756, 759 (1959)(citation omitted); *Paul v. Petroleum Equipment Tools Co.*, 708 F.2d 168, 170 (5th Cir. 1983)(citation omitted). The employer has the

burden of establishing that it is entitled to the exemption. *Dole v. Mr. W Fireworks, Inc.*, 889 F.2d 543, 546 (5th Cir. 1989)(citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 80 S.Ct. 453, 456-57(1960)).

Prior to 1990, the computer professional exemption to the overtime requirements of the FLSA was not directly or expressly provided for. Thus, a computer worker had to be shoehorned into the general executive, administrative, or professional exemptions. *See, Gorman v. Continental Can Company*, 1985 WL 5208 (N.D. Ill.12/31/1985). The employer's efforts were further complicated by the Department of Labor's ("DOL") stance that the work of computer operators was "highly technical and mechanical" and based on skill that did not require advanced learning of a scholarly character. William G. Whittaker, *Computer Services Personnel: Overtime Pay Under the Fair Labor Standards Act*, Cong. Research Serv., Order Code RL30537, at CRS-5 (updated Feb. 7, 2005)(citing Opinion letter signed by Clarence T. Lundquist, United States Wage-Hour Administrator, Apr. 14, 1966).

Addressing the applicability of the professional exemption to data processing employees, the DOL stated that

> . . . at the present time the computer sciences are not generally recognized by colleges and universities as a bona fide academic discipline with standardized licensing, certification, or registration procedures. There is too much variation in standards and academic achievement to conclude logically that data processing employees are a part of a true profession of the type contemplated by the regulations."

36 FR 22977 (12/2/1971).

However, the DOL recognized that many systems analysts and high level supervisory programmers qualified under the administrative or executive employee exemptions. *Id*. Thus,

the DOL amended its regulations to address computer analysts and programmers. *See e.g.*, 29 C.F.R. § 541.207(c)(7)(1971-2004).

The status quo was disturbed on November 15, 1990, with the passage of P.L. 101-583. It stated that,

> [n]ot later than 90 days after the date of enactment of this Act, the Secretary of Labor shall promulgate regulations that permit computer systems analysts, computer programmers, software engineers, and other similarly skilled professional workers as defined in such regulations to qualify as exempt executive, administrative, or professional employees under section 13(a)(1) . . . Such regulations shall provide that if such employees are paid on an hourly basis they shall be exempt only if their hourly rate of pay is at least 6 ½ times greater than the applicable minimum wage . . .

P.L. 101-583.[5]

In other words, Congress broadened the § 13(a)(1) exemption so that it applied to computer programmers and the like. In response, the DOL duly enacted final rules effective November 9, 2002. 57 FR 46742 (10/9/1992). The regulations clarified that "employee employed in a bona fide * * * professional capacity" in section 13(a)(1) of the FLSA shall mean any employee:

> (a) Whose primary duty consists of the performance of:
> (4) Work that requires theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering, and who is employed and engaged in these activities as a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker in the computer software field, as provided in § 541.303 . . .

29 C.F.R. § 541.3(a)(4) (1992-2004).

In turn, § 541.303 stated in part that
> (a) Pursuant to Public Law 101-583, enacted November 15, 1990, s 541.3(a)(4)

---

[5] Section 13(a)(1) exempts certain employees employed in bona fide executive, administrative, or professional capacities from § 207's overtime requirements. 29 U.S.C. § 213 (a)(1).

7

provides that computer systems analysts, computer programmers, software engineers, or other similarly skilled workers in the computer software field are eligible for exemption as professionals under section 13(a)(1) of the Act. Employees who qualify for this exemption are highly-skilled in computer systems analysis, programming, or related work in software functions. Employees who perform these types of work have varied job titles. Included among the more common job titles are computer programmer, systems analyst, computer systems analyst, computer programmer analyst, applications programmer, applications systems analyst, applications systems analyst/programmer, software engineer, software specialist, systems engineer, and systems specialist. These job titles are illustrative only and the list is not intended to be all-inclusive. Further, because of the wide variety of job titles applied to computer systems analysis and programming work, job titles alone are not determinative of the applicability of this exemption.

(b) To be considered for exemption under s 541.3(a)(4), an employee's primary duty must consist of one or more of the following:
> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;
> (2) The design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
> (4) a combination of the aforementioned duties, the performance of which requires the same level of skills.

(c) The exemption provided by s 541.3(a)(4) applies only to highly-skilled employees who have achieved a level of proficiency in the theoretical and practical application of a body of highly-specialized knowledge in computer systems analysis, programming, and software engineering, and does not include trainees or employees in entry level positions learning to become proficient in such areas or to employees in these computer-related occupations who have not attained a level of skill and expertise which allows them to work independently and generally without close supervision. The level of expertise and skill required to qualify for this exemption is generally attained through combinations of education and experience in the field. While such employees commonly have a bachelor's or higher degree, no particular academic degree is required for this exemption, nor are there any requirements for licensure or certification, as is required for the exemption for the learned professions.

> (d) The exemption does not include employees engaged in the operation of computers or in the manufacture, repair, or maintenance of computer hardware and related equipment. Employees whose work is highly dependent upon, or facilitated by, the use of computers and computer software programs, e.g., engineers, drafters, and others skilled in computer-aided design software like CAD/CAM, but who are not in computer systems analysis and programming occupations, are also excluded from this exemption.

29 C.F.R. § 541.303(a)-(d)(1992-2004).

The exemption as fleshed out in the regulations also required *inter alia*, that the employee engage in work requiring "the consistent exercise of discretion and judgment . . ." 29 C.F.R. § 541.3(e).

In 1996, Congress again amended the FLSA and created a new exemption category listed as §13(a)(17). The new section specifically exempted:

> any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is--
> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;
> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or
> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and
>
> who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour.

29 U.S.C. § 213 (a)(17).

Despite the change in the law, the DOL did not revise its regulations until April 23, 2004, with an effective date of August 23, 2004 – *i.e.* not until after the relevant period in the instant matter. 69 FR 22122 (4/23/04). However, in the revision, the DOL acknowledged that its prior requirements that the computer professional enjoy a high level of skill and expertise in "theoretical and practical application" of specialized computer systems knowledge, and that he

9

"consistently exercise discretion and judgment" were inconsistent with the 1996 legislation. *Id.*[6] Accordingly, the DOL did away with those requirements. *Id.*

Although, the DOL did not amend and dispense with the foregoing regulations until 2004, it is manifest that they were supplanted by Congress in its 1996 enactment of § 213(a)(17). Indeed, unlike the original 1990 statute, the 1996 legislation included no delegation of rule-making authority to the DOL to further interpret or define the scope of the exemption. 69 FR 22122 (4/23/04). Yet, the original 1990 statute was not repealed by the 1996 amendment. Thus, the only plausible interpretation of the DOL regulations prior to the pre-2004 revision is that they applied only to the computer professional exemption under § 213(a)(1), and not to the exemption set forth in § 213(a)(17).[7]

In the case *sub judice*, defendant specifically pled that plaintiff was exempt from the overtime requirements by reason of Section 13(a)(1) of the FLSA, 29 U.S.C. § 213(a)(1). (Def. Answer, 1st Affirm. Defense). Moreover, throughout the litigation, defendant has consistently referenced and relied solely on § 13(a)(1) and the implementing regulations of 1992. (*See*, Def. Motion for Summary Judgment, pg. 2; Def. Post-Trial Brief, pg. 1). Nonetheless, we must address potential affirmative defenses, *sua sponte*, especially under circumstances where a party's

---

[6] In *Bobadilla v. MDRC*, the parties recognized that the 1996 legislation: 1) dispensed with Section 213(a)(1)'s requirement that the computer professional exemption apply "only to highly-skilled employees who have achieved a level of proficiency in the theoretical and practical application of a body of highly specialized knowledge;" 2) eliminated any reference to educational requirements; and 3) eliminated the requirement that the employee's work require the exercise of independent judgment and discretion. *Bobadilla v. MDRC*, 2005 WL 2044938 (S.D. N.Y. 2005).

[7] In its revision, the DOL acknowledged the possibility that it could have maintained separate requirements for the two statutory provisions, but opted not to do so. 69 FR 22122 (4/23/04).

failure to argue a point would otherwise deprive the court of a potentially dispositive decisional tack. *See*, *Baylor University Medical Center v. Heckler*, 758 F.2d 1052, 1058 (5th Cir. 1985).[8] Due to defendant's invocation of the computer professional exemption, we are compelled to analyze the exemption under § 13(a)(17), – notwithstanding defendant's failure to formally plead or argue that section.

We recognize that an affirmative defense that is not asserted in a responsive pleading is generally deemed waived. *Jones v. Miles*, 656 F.2d 103, 108 (5th Cir. 1981). However, the technical failure to precisely comply with this rule is not fatal where the matter is raised such that it does not result in unfair surprise to the plaintiff. *Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 855-856 (5th Cir. 1983). Here, plaintiff cannot allege unfair surprise because he was under the impression that defendant had invoked § 213(a)(17). (*See*, Pl. Post-Trial Brief, pg. 1). Similarly, in our ruling on defendant's motion for summary judgment, we cited §213(a)(17). (*See*, December 5, 2005, Memorandum Ruling).

The only potential surprise to plaintiff is our belated recognition that the pre-2004 regulations do not apply to the § 213(a)(17) computer professional exemption. Yet, any such surprise is not unfair. We cannot conceive how plaintiff might have been prejudiced in his conduct of the trial. Applying § 213(a)(17) and excluding the DOL's pre-2004 regulations merely relieved defendant of establishing additional elements of the § 213(a)(1) computer professional exemption.

---

[8] In fact, we may well have reached a different outcome in this matter had we considered the computer professional exemption solely as set forth in § 213(a)(1), and as implemented in the DOL's 1992 regulations.

Pursuant to § 213(a)(17), the computer professional exemption plainly applies *inter alia* to any systems analyst, computer programmer or other similarly skilled worker whose primary duty is "the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications, . . . ." 29 U.S.C. § 213 (a)(17)(B).[9]

We readily find that during the relevant period Pellerin worked as a computer programmer or other similarly skilled worker. *See*, Relevant Testimony Summary, *supra*. We further find that during the relevant period, Pellerin's primary duty was the development, analysis, creation, testing and/or modification of computer programs based on user specifications. (Tr. 23, 31,109, 182-184, 198, Def. Exh. 7). Thus, during all relevant periods, Pellerin was a computer professional exempt from the overtime requirements of the FLSA. Accordingly, Pellerin is not entitled to overtime benefits and related damages. Judgment will be entered in favor of defendant.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 18th day of May, 2006.

_____
ALONZO P. WILSON
UNITED STATES MAGISTRATE JUDGE

---

[9] One could argue that the last clause of § 213 (a)(17) limits the exemption to those who earn at least $27.63 per hour. *See*, 29 C.F.R. § 541.400 (2004-). However, we read that last clause as imposing an additional requirement only for those employed on an hourly basis. This interpretation is consistent with legislative comments addressing similar language in the 1990 legislation, and the DOL's resolution of same. 57 FR 46742 (10/9/1992).